Elizabeth OKORAFOR, Appellant,

v.

**UNCLE SAM & ASSOCIATES, INC., Appellee.**

No. 01–07–00908–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 23, 2009.

Rehearing Overruled Sept. 14, 2009.

James Okoro Okorafor, The Law Firm of Okorafor & Mgbaraho, Elizabeth Okorafor, Houston, TX, for Appellant.

Jimmie L.J. Brown Jr., Law Office of Jimmie L.J. Brown, Jr., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices HIGLEY and NUCHIA.*

---

* Justice Sam Nuchia, who retired from the First Court of Appeals on January 1, 2009, continues to sit by assignment for the disposition of this case, which was submitted on October 28, 2008.

## OPINION

SHERRY RADACK, Chief Justice.

Appellant, Elizabeth Okorafor (Elizabeth) did not prevail on her motion to compel arbitration in the trial court, and now seeks to set that ruling aside in this interlocutory appeal. *See* Tex. Civ. Prac. & Rem.Code Ann. § 171.098(a)(1) (Vernon 2005) (authorizing appeal of interlocutory order denying motion to compel arbitration brought pursuant to Texas General Arbitration Act (TGAA), which is chapter 171 of Civil Practice and Remedies Code, Tex. Civ. Prac. & Rem.Code § 171.001–.098 (Vernon 2005)). In four issues, Elizabeth argues that (1) she met her burdens to present a valid agreement to arbitrate and claims encompassed by that agreement, (2) the trial court erred by requiring that Elizabeth comply with past due discovery and (3) by deeming that discovery deficient, and by denying the motion to compel on that basis, and (4) the trial court erred by determining that Elizabeth waived any right to arbitrate based on either (a) her litigation activity, or (b) her not seeking to arbitrate before appellee, Uncle Sam & Associates, Inc., filed this action. We affirm.

## Background

### A. The Agreement

The underlying dispute arises from a "Contractor Agreement" (the agreement) to build a residence at 9020 Regal Point, Richmond, Texas 77469, in the Royal Lakes Subdivision, Fort Bend County. The parties to the agreement were Elizabeth, identified as owner of the property,

and Uncle Sam, as contractor. The total recited consideration of $450,000 was to be paid in installments according to a separate payment schedule added to the agreement.[1] The parties signed the agreement on April 13, 2006.[2] The agreement specified that "time was of the essence," and that work would begin on May 13, 2006 and be completed by February 13, 2007. Paragraph 10 of the general provisions of the agreement stated that all disputes were to be "resolved by binding arbitration in accordance with the rules of the American Arbitration Association." An addendum to the agreement, executed on April 17, 2006, authorized Uncle Sam to "retain an enforceable lien on the property to guarantee the payment of the outstanding balance of the contract."

### B. Initial Payment and Anticipatory Breach

Elizabeth made an initial payment of $40,000, and work on the project began with the foundation, as specified in the agreement. A dispute arose, however, between Uncle Sam and supervisors whom Elizabeth had hired to supervise construction. Uncle Sam requested the second installment in writing on July 4, 2006, claiming it was due under the agreed payment schedule because the foundation was complete.

Seven weeks later, however, on August 21, 2006, Elizabeth declared an anticipatory breach and issued a "formal notice of the suspension and anticipatory repudiation," in which she notified Uncle Sam of her intent to terminate the project due to lack of funds. Uncle Sam filed a "contrac-

---

1. The agreement specified that construction would include the "[f]oundation, framing, cornice, rough and finish MEP, insulation, finish interior and exterior walls, paint and wall finished, floors, doors, windows, cabinets, and countertops."

2. An additional agreement, signed four days later, on April 17, 2006, stated that the total amount of payments due Uncle Sam from Elizabeth was $250,000 and also authorized her to engage the services of an architect or project manager.

tor's" lien [3] on the property on September 21, 2006 and gave notice of a claim pursuant to that lien six days later.

## C. This Lawsuit

### 1. *December 2006 to July 31, 2007—Increasingly Complex Litigation*

This case began as a suit on a sworn account filed by Uncle Sam to collect on the agreement. On December 6, 2006, Uncle Sam filed its original petition on a sworn account against both Elizabeth and James O. Okorafor (Okorafor).[4] The Okorafors initially filed a general denial, which they promptly amended by a verified denial of the account. *See* TEX.R. CIV. P. 185.

The issues before the trial court increased significantly seven months later, on July 31, 2007, when the Okorafors filed the extensively amended answer that is their current live pleading. The amended petition included seven "non-exclusive affirmative defenses," [5] six verified denials,[6] and a claim that four conditions precedent to the agreement remained unsatisfied.[7] The stated conditions precedent included failure to submit the controversy to arbi-

tration, but the Okorafors did not move to compel arbitration.

Instead, their amended pleading asserted a total of six counterclaims, as follows: breach of contract; DTPA violations; negligence, including negligent hiring; breach of an implied covenant of good faith; and breach of an implied warranty of "workmanlike services." In addition, the Okorafors asserted claims for declaratory relief, seeking judgments declaring that neither Okorafor nor Elizabeth had any liability to Uncle Sam, or, alternatively, that Elizabeth had no liability beyond "$150,000" [8]; that Uncle Sam's mechanic's lien was improper or "imperfect"; and that no privity of contract existed between Okorafor and Uncle Sam. The amended pleading concludes by asserting a request for attorney's fees and a motion for sanctions pursuant to rule 13, for allegedly false affidavits. *See* TEX.R. CIV. P. 13.

### 2. *September 13, 2007—Motion to Compel Arbitration or to Dismiss, and to "Dissolve Bogus Lien"*

After receiving the discovery they had requested of Uncle Sam, the Okorafors

---

**3.** *See* TEX. PROP.CODE ANN. § 53.021 (Vernon 2007).

**4.** We refer to Elizabeth and Okorafor jointly as "the Okorafors." Okorafor is a licensed Texas attorney. The trial court's docket entries recite that Okorafor appeared both as a pro se defendant and as counsel for Elizabeth, and Okorafor stated on the record that he and Elizabeth married in Houston in 1985. Both Okorafors answered Uncle Sam's lawsuit, and the order denying the motion to compel arbitration, filed by Elizabeth, identifies both Elizabeth and Okorafor as defendants. Elizabeth filed a pro se notice of appeal, but Okorafor did not file a notice of appeal, though he signed the certificate of service for the notice. He appears in this Court as counsel for Elizabeth.

**5.** The affirmative defenses included failure of consideration for the "alleged" debt, fraud,

payment, contributory negligence, accord and satisfaction, and lâches.

**6.** The verified denials asserted the following: defect of the parties because of capacity, as to Okorafor, denial of execution, as to Okorafor; challenge to Uncle Sam's corporate status; denial of consideration for the underlying agreement; denial of account; and denial of notice by Uncle Sam for claim of loss and damages.

**7.** The conditions precedent included the following: obtaining a certificate of completion before payment; failure to submit the controversy to arbitration; lack of a "proper" lien; and failure to properly perfect the lien. The Okorafors did not move to compel arbitration until mid-September.

**8.** This amount may be a typographical error. See footnote 2.

departed from their aggressive counter-claim strategy of just six weeks earlier. On September 17, 2007, five days before the Okorafors' responses to discovery requested by Uncle Sam were due, Elizabeth filed and served on Uncle Sam a motion seeking to compel resolution of the controversy by arbitration.

In the same filing, however, Elizabeth alternatively moved to dissolve Uncle Sam's $140,000 contractor's lien, which she described as "bogus."[9] In the portion of the motion that requested arbitration or to dismiss, Elizabeth focused on the arbitration clause in the agreement. She argued that arbitration was mandatory and that Uncle Sam's action should be dismissed. The motion did not address either the procedural context of the pending litigation, specifically, the Okorafors' counterclaims and their requests for declaratory relief, attorney's fees, or sanctions, or the status of the discovery that Uncle Sam had requested and was due.[10]

Uncle Sam opposed the motion to compel arbitration on the grounds that the Okorafors had substantially invoked the litigation process, to Uncle Sam's prejudice, and therefore had waived any right to arbitrate the dispute. As evidence of intent to litigate, rather than negotiate by

arbitration, Uncle Sam first cited Elizabeth's notice of anticipatory breach and her stated intent to cancel the agreement in its entirely, despite the narrow time frame for completing the project. Uncle Sam also argued that the Okorafors had "fully engaged in discovery," in the form of "requests for disclosures, interrogatories, request for production and [requests for] admission." Though Uncle Sam had already fully complied with that discovery, the Okorafors had not responded at all to the discovery requested of them by Uncle Sam. The outstanding discovery due from Uncle Sam included a request for disclosure, a request for production, and a first set of interrogatories. In addition, because the Okorafors had not responded to Uncle Sam's requests for admission, Uncle Sam stated its intent to seek their answers as deemed admitted for that reason.[11]

## D. Hearings on the Motion to Compel

### 1. October 1, 2007

As noticed by Elizabeth, the October 1, 2007 hearing addressed her motion to compel arbitration, but focused primarily on Uncle Sam's opposing contention that the Okorafors had waived arbitration by aggressively pursuing a litigation strategy.

---

**9.** Elizabeth attached to her motion a copy of the "Certificate of Conference–Motion to Compel Arbitration and to Dissolve Bogus Lien" that Okorafor had delivered to Uncle Sam's counsel by telecopier four days earlier, on September 13, 2007. This certificate notified Uncle Sam that a motion to compel arbitration would be filed and asked that the lawsuit be dismissed with prejudice and the lien be discharged, or, in the alternative, that Uncle Sam agree to refer the case to arbitration. A final paragraph requested that the certificate be considered "as a formal request for a thirty days [sic] extension of time to respond to your discovery requests." The record reflects that discovery was due on September 22, 2007.

**10.** Regarding Uncle Sam's mechanics and materialman's lien, the motion asked that "the bogus lien" be dissolved "pending resolution of this matter by arbitration including the determination of any outstanding balance(s) which may become the subject of a proper lien."

**11.** The same response included Uncle Sam's replies to the portion of Elizabeth's motion that sought to dissolve Uncle Sam's contractor's lien. Among other grounds, Uncle Sam challenged whether Elizabeth had complied with the formal and substantive requirements of section 53.160 of the Property Code, which provides for "Summary Motion to Remove Invalid or Unenforceable Lien." *See* TEX. PROP. CODE ANN. § 53.160 (Vernon 2007).

Uncle Sam claimed the recent switch in strategy was prejudicial and vigorously objected to arbitration. As Uncle Sam explained, the Okorafors had initiated the discovery process, and Uncle Sam had fully responded, but the Okorafors had not yet complied with discovery requested of them by Uncle Sam, which had been past due since September 22, 2007.[12] The Okorafors' motion to compel arbitration was prejudicial at this point in the proceedings, argued Uncle Sam, because the Okorafors had gained an unfair advantage by gaining familiarity with Uncle Sam's case through the discovery provided by Uncle Sam. Yet, argued Uncle Sam, "We know absolutely nothing about their case," because "They've not responded to our [requests for] disclosures. They've not responded to our requests for production. They've not responded to our requests for interrogatories."

After considering Uncle Sam's contentions and Okorafor's opposing contentions, the trial court continued the hearing to one week later. The trial court also ruled that Elizabeth and Okorafor had to comply with Uncle Sam's discovery requests within that week. The trial court explained, "[I]f you have responded to [Uncle Sam's] discovery by then, then I will consider your motion. If you have not, I'll consider your motion, but whether or not you've responded to the discovery will probably affect my ruling."

At the hearing one week later, the trial court focused on the extent to which the Okorafors had complied with Uncle Sam's discovery requests and the effect of that determination on Elizabeth's motion to compel arbitration. Uncle Sam urged the trial court that the Okorafors' strategies continued to prejudice Uncle Sam because their discovery responses were vague and inadequate. Discovery that remained outstanding included the following: a description or attempt to quantify the damages claimed; invoices or estimates for claimed repairs relating to plumbing defects in Uncle Sam's workmanship; bank records to support Elizabeth's claim that she lacked funds to continue construction; contact information for persons with knowledge of relevant facts; and clarification whether Okorafor and Elizabeth were a married couple, for purposes of determining joint liability.

The record of the hearing reflects that the trial court scrutinized the Okorafors' discovery responses and considered their rebuttal contentions, as well as Uncle Sam's contentions that prejudice remained from the Okorafors' having vigorously pursued a litigation strategy because their incomplete, missing, or inadequate discovery responses would hamper Uncle Sam, should the trial court compel arbitration. The trial court agreed with Uncle Sam. Returning to the Okorafors' pending motion to compel arbitration, the trial court denied the requested relief, stating

The reason for the hearing today was to determine your responses to [Uncle Sam's] discovery to see whether or not the Court was going to grant your motion to compel arbitration, and I have considered your responses to [Uncle Sam's] discovery, I have found them to be deficient, and that it would be an unfair advantage for you to have the benefit of [Uncle Sam's] discovery, which was sent to you, but you had not fully responded to [Uncle Sam's] discovery to you. . . .

The Okorafors challenge the trial court's ruling in this interlocutory appeal.

### FAA or TGAA?

We must first determine whether the Federal Arbitration Act (FAA) or the

---

12. The record indicates that, before the hearing, Uncle Sam had filed motions to compel the outstanding discovery and to deem admissions.

TGAA applies because the inquiry is dispositive of our jurisdiction. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.098(a)(1); *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 778 (Tex.2006); *see also id.*, 196 S.W.3d at 784 & n. 4 (Brister, J., concurring); *Kilroy v. Kilroy*, 137 S.W.3d 780, 783 (Tex.App.-Houston [1st Dist.] 2004) (orig. proceeding) (stating that Court must address its jurisdiction even if not raised by parties) (citing *McCauley v. Consol. Underwriters*, 157 Tex. 475, 304 S.W.2d 265, 266 (1957)).

█ Absent certain exceptions that do not apply here, the FAA applies to all suits in state or federal court when the dispute concerns a "contract evidencing a transaction involving commerce," *See* 9 U.S.C.S. § 2 (2008); *see also* 9 U.S.C.S. § 1 (defining "commerce"). The FAA extends as far as the Commerce Clause of the United States Constitution will reach. *In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex.2005).

█ Section 2 of the FAA reflects the intent of Congress to establish a liberal federal policy that (1) favors arbitration, despite contrary substantive or procedural state policies, and (2) establishes a federal substantive law of arbitrability that applies to any arbitration agreement within the FAA. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

## A. When Both FAA and TGAA May Apply, Question of Preemption Arises

█ The arbitration clause in the agreement between Elizabeth and Uncle Sam states only that the rules of the American Arbitration Association shall apply; the clause does not specify whether the FAA or the TGAA controls. When arbitration provisions do not specify whether the TGAA or the FAA applies, with the result that both may apply, a question of federal preemption arises. *See In re D. Wilson Constr.*, 196 S.W.3d at 779–80.

█ The FAA preempts only *contrary* state law, not *consonant,* state law. *See id.* at 779. No provision of the FAA expressly exempts state law, but state law may nonetheless conflict with the FAA "to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of Congressional intent in enacting the FAA.[13] The dispositive inquiry is whether application of state law "would undermine the goals and policies of the FAA." *In re D. Wilson Constr.*, 196 S.W.3d at 779; *see also Jack B. Anglin Co.*, 842 S.W.2d 266, 271 (Tex. 1992) ("[The FAA] preempts state statutes to the extent they are inconsistent with [the FAA]"; holding that FAA preempted nonwaiver provisions of DTPA).

## B. No FAA Preemption—Texas Law Does not Prevent Enforcement

█ Applying state law will undermine the goals and policies of the FAA, which will, therefore, preempt the contrary state law, when, but *only* when: (1) the agreement is in writing; (2) it involves interstate commerce; (3) it can withstand scrutiny under traditional contract defenses

---

13. *See In re D. Wilson Constr.*, 196 S.W.3d 774, 780 (Tex.2006) (quoting *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477–78, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941))); *see also Perry v. Thomas*, 482 U.S. 483, 489, 492 & n. 9, 107 S.Ct. 2520, 2525, 2527 & n. 9, 96 L.Ed.2d 426 (1987) (stating that supremacy clause of United States Constitution compels that FAA control over state legislative or judicial attempts to undercut enforceability of arbitration agreements) (citing *U.S. CONST.* art. IV, cl. 2.).

under state law and (4) *state law affects enforceability of the agreement."* *In re D. Wilson Constr.*, 196 S.W.3d at 780 (emphasis in original) (citing *In re Nexion Health at Humble, Inc.*, 173 S.W.3d at 69 (stating four-part test)).

■ This case involves a written agreement for construction of a residence. Regarding any effect on interstate commerce, the record shows that Elizabeth is a Texas resident and that Uncle Sam's representative signed the agreement as officer of a Texas corporation. Yet, construction was to include "[f]oundation, framing, cornice, rough and finish MEP, insulation, finish interior and exterior walls, paint and wall finished, floors, doors, windows, cabinets, and countertops" and therefore at least contemplated some requirement that materials would be obtained through interstate commerce. "That a contract affects interstate commerce," and thus triggers *potential* enforceability under the FAA, however, "does not preclude enforcement under the [TGAA] as well." *Id.* (holding that court of appeals erred by concluding that FAA controlled on grounds that contract affected interstate commerce without considering whether state law affected enforceability of agreement).

■ The fourth step of the four-part, preemption analysis is dispositive, however, and we hold, based on the record presented, that Texas law does not "affect[ ] enforceability" of the arbitration clause in the agreement between Elizabeth and Uncle Sam. For the FAA to control and thus preempt enforcement under the TGAA, Texas law must affect enforceability of the arbitration clause in the agreement. *See id.* (noting that TGAA expressly exempts certain claims to which it does not apply). For the FAA to preempt state law, state law must *refuse to enforce* an arbitration agreement that the FAA *would enforce,* either because (1) the TGAA has expressly

exempted the agreement from coverage, *see* TEX. CIV. PRAC. & REM.CODE ANN. § 171.002(a) (detailing various claims to which the TGAA does not apply), or (2) the TGAA has imposed an enforceability requirement not found in the FAA. *See id.*

Section 171.002 of the Remedies Code governs the scope of the TGAA. By her agreement with Uncle Sam, Elizabeth acquired Uncle Sam's services to construct a residence. Subsection (a)(2) exempts certain contracts for the acquisition of services from the TGAA, provided "the total consideration to be furnished by the individual is not more than $50,000, except as provided by Subsection (b)." TEX. CIV. PRAC. & REM.CODE ANN. § 171.002(a)(2). Pursuant to subsection (b), "an agreement described by Subsection (a)(2) is subject to this chapter if":

(1) the parties to the agreement agree in writing to arbitrate; and

(2) the agreement is signed by each party and each party's attorney.

TEX. CIV. PRAC. & REM.CODE ANN. § 171.002(b)(1)-(2). The total consideration for the agreement here exceeds $50,000 and, though the agreement is signed by both Elizabeth and Uncle Sam, neither party's attorney signed it. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.002(a)(2), (b)(1)-(2). Therefore, the TGAA does not exempt the agreement between Elizabeth and Uncle Sam.

In addition, no provision of the TGAA imposes an enforceability requirement not found in the FAA on the agreement at issue here, *see In re D. Wilson Constr.*, 196 S.W.3d at 780, and neither Elizabeth nor Uncle Sam invokes any provision of the TGAA or other state law that would subvert enforcement of the agreement. Therefore, the FAA does not preempt the TGAA in this case. Because the TGAA applies, and the FAA does not preempt,

this Court has jurisdiction over this inter-locutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.098(a)(1); *cf., In re D. Wilson Constr., Co.,* 196 S.W.3d at 780 (concluding that court of appeals had juris-diction under TGAA for both interlocutory appeal and original proceeding for writ of mandamus).

## Whether the Okorafors Substantially Invoked the Litigation Process to Uncle Sam's Prejudice

Elizabeth asks that we reverse the trial court's order denying her motion to com-pel on the grounds that she met her bur-den to present a valid agreement to arbi-trate and claims encompassed by that agreement and, therefore, that the trial court erred by (1) requiring that Elizabeth comply with past due discovery, (2) deem-ing that discovery deficient, and (3) deny-ing the motion to compel on that basis. In issue four (a), Elizabeth contends that the trial court erred by determining that Eliz-abeth waived any right to arbitrate, either (a) because of her litigation activity, or (b) because she did not seek to arbitrate be-fore Uncle Sam filed this action.

Elizabeth presents nothing for review by her issue four (b), because the record does not show or even suggest that the trial court denied Elizabeth's motion to compel because she did not seek arbitration until after Uncle Sam filed this action. *See* TEX.R.APP. P. 33.1(a) (requiring that error be preserved as prerequisite for appellate review). We overrule issue four (b). Re-garding Elizabeth's first issue, that she established her right to arbitrate by prov-ing a valid agreement and claims that fell within it, Elizabeth's issue would lack mer-it even if correct if we conclude that the Okorafors had waived any right they had to arbitrate. Accordingly, we turn to the second and third issues, which address the

waiver issue and which we address togeth-er.

We must first address the terms chosen by Elizabeth to state issues three and four. As stated in her brief, Elizabeth contends in her second issue that the trial court erred by deferring ruling on the motion to compel "to enable more discovery." Noth-ing in the record shows or suggests that the trial court enabled "more" discovery at the close of the October 1, 2007 hearing. Instead, the trial court required that the Okorafors meet their long-standing duty to respond to Uncle Sam's past-due discovery requests that Uncle Sam had filed before Elizabeth filed her motion to compel. As the trial court's comments indicate, the prejudice to Uncle Sam resulted directly from the Okorafors' failure to comply with discovery requested by Uncle Sam. This is because Uncle Sam would be undertaking arbitration without benefit of any discov-ery regarding the Okorafors' multiple counterclaims, despite having provided dis-covery requested by the Okorafors. In short, the Okorafors had substantially in-voked the litigation process, through their recent counterclaims, to Uncle Sam's prej-udice.

Elizabeth also suggests that the trial court deemed only "some" of the Okora-fors' discovery responses deficient. To the contrary, all of their discovery was defi-cient. As the record reflects, the trial court "considered [the Okorafors'] re-sponses" to Uncle Sam's discovery re-quests and "found *them* to be deficient." (Emphasis added.) The responses were so "deficient" that they essentially provided no information at all. Elizabeth also con-tends that the discovery that she and Oko-rafor initiated was "minimal," but the char-acterization is neither correct nor relevant, as the following analysis explains.

As in the trial court, Uncle Sam con-tends that the Okorafors had invoked the

litigation process to a degree that resulted in waiver of any right they had to arbitrate. We agree.

## A. Standard of Review

### 1. *Totality of Circumstances Determines Waiver of Arbitration Rights*

■ We resolve waiver of arbitration as a question of law by applying a totality-of-the-circumstances test to the particular circumstances of the case. *See In re Fleetwood Homes*, 257 S.W.3d 692, 694 (Tex.2008) (citing *Perry Homes v. Cull*, 258 S.W.3d 580, 590 (Tex.2008)).

■ Settled law recognizes a strong presumption against waiver. *In re D. Wilson Constr.*, 196 S.W.3d at 783. Accordingly, the party opposing arbitration, Uncle Sam in this case, must prove that it has been prejudiced by establishing that the party seeking to compel arbitration, here Elizabeth, has substantially invoked the litigation process to the opposing party's "detriment." *See In re Fleetwood Homes*, 257 S.W.3d at 694; *Perry Homes*, 258 S.W.3d at 590; *In re Bank One, N.A.*, 216 S.W.3d 825, 827 (Tex.2007); *In re Vesta Ins. Group*, 192 S.W.3d 759, 763 (Tex.2006) (referring to "detriment" and "prejudice" as equal terms). In determining waiver of arbitration rights, detriment or prejudice to the opponent means "inherent unfairness caused by 'a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage.'" *In re Fleetwood Homes*, 257 S.W.3d at 694 (citing *Perry Homes*, 258 S.W.3d at 596).

### 2. *Underlying Factual Determinations Require Deference*

■ Denial of a motion to compel arbitration generally triggers the abuse-of-discretion standard. *See In re D. Wilson Constr. Co.*, 196 S.W.3d at 780 (applying standard to grant mandamus relief under FAA). A trial court abuses its discretion when it acts arbitrarily or unreasonably and without reference to any guiding rules or principles. *See In re Bruce Terminix Co.*, 988 S.W.2d 702, 703 (Tex.1998); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). Because a trial court has no discretion in determining what the law is, which law governs, or how to apply the law, we review this category of discretionary rulings de novo. *See In re D. Wilson Constr. Co.*, 196 S.W.3d at 780 (citing *Walker*, 827 S.W.2d at 840). This standard controls when we review the trial court's legal rulings and thus controls the trial court's ultimate conclusion that any right to arbitrate had been waived. *Cf., In re Fleetwood Homes*, 257 S.W.3d at 694 (describing resolution of waiver as "legal question for the court based on the totality of circumstances").

■ When the ruling under review results from the trial court's having resolved underlying facts, we must defer to the trial court's factual resolutions and any credibility determinations that may have affected those resolutions, and we may not substitute our judgment for the trial court's judgment in those matters. *See Walker*, 827 S.W.2d at 839. As applied to this case, this more deferential standard controls the trial court's factual determination that the Okorafors did not sufficiently comply with the discovery requested by Uncle Sam and the resulting factual determination that, among the totality of the circumstances, lack of discovery prejudiced Uncle Sam. *See In re Fleetwood Homes*, 257 S.W.3d at 694.

■ The more deferential standard is particularly appropriate for reviewing these determinations because the record contains only the Okorafors' notice of filing for six discovery responses, filed on the Friday before the second hearing on the

motion to compel arbitration held on October 8, 2007. The record of that hearing shows that the trial court considered those responses extensively and questioned both counsel in depth regarding the adequacy of the Okorafors' responses. But neither party moved that the responses be admitted into evidence or otherwise be made part of the record so that we might review them in conducting our analysis. This is not an appeal premised on a partial reporter's record. *Cf.* TEX.R.APP. P. 34.6(c)(4) (authorizing presumption that partial reporter's record constitutes "entire record," provided rule 34.6(b) procedures followed). We must presume, therefore, that the missing responses by the Okorafors support the trial court's ruling.[14] *Feldman v. Marks*, 960 S.W.2d 613, 614 (Tex.1996).

**B. Right to Arbitrate Waived**

 "Waiver ... asks whether a party has substantially invoked the judicial process to the opponent's detriment, the latter term meaning inherent unfairness caused by a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage." *See In re Citigroup Global Mkts.*, 258 S.W.3d 623, 626 (Tex.2008) (quoting *Perry Homes*, 258 S.W.3d at 597). Waiver of arbitration rights may be express or implied. *See Perry Homes*, 258 S.W.3d at 593. Express waiver arises when a party affirmatively indicates that it wishes to resolve the case in the judicial forum, rather than through arbitration. *In re Citigroup Global Mkts.*, 258 S.W.3d at 626 (rejecting express waiver premised on party's having sought transfer to federal multidistrict-litigation court). Implied waiver arises when a party acts (1) inconsistently with the right to arbitrate and (2) prejudices the opposing party. *See id.* In this case, Uncle Sam's waiver contentions invoke implied waiver.

**1. *In re MHI Partnership, Ltd.,* Does Not Apply**

Elizabeth challenges the trial court's refusal to compel arbitration by arguing that the trial court had "no discretion" but to compel arbitration because this case is indistinguishable from *In re MHI P'ship, Ltd.*, 7 S.W.3d 918, 923 (Tex.App.-Houston [1st Dist.] 1999) (orig. proceeding). We distinguish *In re MHI*, which held, based on significantly narrowed issues, that a trial judge "had no discretion to defer" a ruling on a motion to compel arbitration "until after discovery had been completed." *See id.*

The parties who opposed arbitration in *In re MHI* had contested only the validity and scope of the arbitration provision, neither of which is at issue here. *See id.* Accordingly, section 171.021 of the TGAA narrowly defined the scope of the trial court's inquiry as limited to deciding whether to grant the motion to compel. *See id.*, 7 S.W.3d at 921–22. Noting this limited inquiry and the summary nature of the proceedings contemplated by section 171.021, this Court reasoned that the trial court's decision to delay arbitration until after the parties had completed discovery "substantially defeat[ed] section 171.021's abbreviated procedure," and, in addition, "violate[d] section 171.021's mandate to decide the issue summarily." *Id.*, 7 S.W.3d at 923. There was no contention, as in this case, that the parties who sought to compel arbitration had so substantially invoked the litigation process that they had waived any right to arbitrate. Likewise, there was no claim, as here, that their having invoked the litigation process prej-

---

14. Both parties have attached documents to their briefs that were not made part of the record on appeal and that we may not consider for that reason. *Williams v. Chisolm*, 111 S.W.3d 811, 816 n. 4 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

udiced the opponents. *In re MHI* does not apply.

## 2. *The Okorafors Substantially Invoked the Litigation Process*

■ The totality of circumstances presented by this case demonstrates an attempt by the Okorafors to "have it both ways." *See In re Citigroup Global Mkts.*, 258 S.W.3d at 626 (quoting *Perry Homes*, 258 S.W.3d at 597). Seven months after filing a simple denial of a sworn account, the Okorafors assumed an aggressive litigation strategy through amended pleadings that sought affirmative relief. The amended pleadings encompassed seven "non-exclusive affirmative defenses," six verified denials, a contention that four conditions precedent to Uncle Sam's recovery remained unsatisfied, six counterclaims, several claims for declaratory relief, and requests for attorney's fees and sanctions. This aggressive litigation strategy included discovery requests related to their newly asserted counterclaims, to which Uncle Sam provided responses and then served discovery on the Okorafors.

As soon as Uncle Sam complied with the Okorafors' discovery requests and served its own discovery requests, however, Elizabeth moved the trial court to compel arbitration. At that point, the Okorafors had already benefitted from the discovery provided by Uncle Sam, and their own discovery was due. Even as Elizabeth filed her motion to compel, Okorafor sought Uncle Sam's agreement to an extension for the Okorafors' past-due discovery responses that included requests for admissions at risk of being deemed admitted for lack of response. One request invoked an intent to arbitrate; the other contravened that spirit and reflected an intent to pursue litigation.

These circumstances reflect a concerted effort, some seven months into a simple defense strategy of denying a sworn ac-

count, to escalate that process by multiple sworn and affirmative defenses, claims of failures of conditions precedent, and affirmative claims for relief, including declaratory relief, and attorney's fees and sanctions. Nonetheless, and despite contending that arbitration was a condition precedent to Uncle Sam's recovery, the Okorafors did not immediately move to compel arbitration. That motion came only after they gained the benefit of discovery relevant to the counterclaims and affirmative defenses of their amended pleading. These circumstances establish, as a matter of law, that the Okorafors had substantially invoked the litigation process.

Armed with discovery provided by Uncle Sam and facing a looming deadline to produce discovery requested by Uncle Sam, the Okorafors tried to have it both ways and moved to compel arbitration. *See In re Fleetwood Homes*, 257 S.W.3d at 694 (citing *Perry Homes*, 258 S.W.3d at 597). Having substantially invoked the litigation process, the Okorafors abruptly attempted to arrest it to gain the advantage of avoiding reciprocal discovery. But, merely invoking the litigation process to a significant extent is not sufficient, in itself, to bar the trial court from referring the dispute to arbitration on waiver grounds.

## 3. *The Okorafors' Strategy Switch Prejudiced Uncle Sam*

■ In the context of waiver of arbitration by substantially invoking the litigation process, the supreme court has defined "detriment" and "prejudice" to the opponent as "inherent unfairness caused by 'a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage.'" *In re Fleetwood Homes*, 257 S.W.3d at 694 (citing *Perry Homes*, 258 S.W.3d at 597). Because of the "strong presumption" against

waiver, which "should govern" "close cases," waiver of arbitration by substantially invoking judicial process compels a "high" evidentiary "hurdle." *Perry Homes,* 258 S.W.3d at 590; *see also In re Bank One, N.A.,* 216 S.W.3d 825, 827 (Tex. 2007) (recognizing "strong" presumption against waiver; further stating that waiver "must be intentional") (citing and quoting *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 89 (Tex.1996) (applying FAA)). The dispositive inquiry, therefore, is whether Uncle Sam established that the Okorafors' switching from a zealous litigation strategy to arbitration produced the necessary degree of prejudice or detriment to warrant waiver of arbitration. *See Perry Homes,* 258 S.W.3d at 595 (declining to vacate requirement that party claiming waiver premised on substantial invocation of judicial process demonstrate prejudice, stating, "[W]e agree ... that waiver of arbitration requires a showing of prejudice.").

Uncle Sam opposed Elizabeth's motion to compel arbitration on the grounds that referring the case to arbitration would be detrimental and result in prejudice to Uncle Sam. Uncle Sam established that the Okorafors were "familiar" with Uncle Sam's case when Elizabeth filed her motion, because they had the benefit of Uncle Sam's having responded to their discovery requests. Because the Okorafors had not complied correspondingly with Uncle Sam's requested discovery, Uncle Sam would be essentially handicapped by having to arbitrate without benefit of any discovery responses from the Okorafors, including potentially deemed admissions.

The trial court was receptive to these arguments at the first hearing on the motion to compel arbitration and questioned Okorafor extensively regarding the past due discovery. Nonetheless, the trial court deferred ruling on the motion by granting the Okorafors a week's extension to provide the past-due discovery. At the second hearing, the trial court ultimately determined that the responses provided within that week were incomplete, missing, inadequate, and thus "deficient." To compel Uncle Sam to arbitrate, thus hampered by a lack of knowledge of the Okorafors' case, would result in an "unfair advantage" to the Okorafors. We agree. Moreover, we must defer to those findings, given that the trial court necessarily resolved disputed facts and may also have made credibility determinations in resolving disputed facts regarding Uncle Sam's complaints and Okorafor's stated reasons for the responses provided and not provided. *See Walker,* 827 S.W.2d at 839–40. We must also presume that the discovery responses that the trial court assessed in reaching those determinations also support the trial court's resolutions because they are not before us in the record on appeal. *See Feldman,* 960 S.W.2d at 614.

In view of the trial court's having determined that (1) the Okorafors had derived a benefit from the litigation strategy that they had vigorously pursued before moving to compel arbitration, and that (2) they had benefitted, in the form of the discovery responses disclosed by Uncle Sam, resulting in an "unfair advantage" to Uncle Sam, which had only "deficient" responses from the Okorafors, we hold as follows on de novo review of the trial court's ruling: Despite the strong presumption against waiver, *see Perry Homes,* 258 S.W.3d at 584, the trial court properly concluded, as a matter of law, after considering the totality of the circumstances presented, that the Okorafors had substantially invoked litigating their claims through the judicial process, had prejudiced Uncle Sam by pursuing an aggressive litigation strategy and by abruptly switching to an arbitration strategy to seek an advantage, and had, therefore, waived any right to arbitration provided by the agreement at issue. *See*

*In re Fleetwood Homes,* 257 S.W.3d at 694 (citing *Perry Homes,* 258 S.W.3d at 590).

We overrule Elizabeth's second and third issues.

## Conclusion

We deny all pending motions, and we affirm the judgment of the trial court.