

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-11-00421-CV

TEXAS STUDENT HOUSING AUTHORITY, APPELLANT

V.

BRAZOS COUNTY APPRAISAL DISTRICT AND APPRAISAL REVIEW BOARD FOR
BRAZOS COUNTY APPRAISAL DISTRICT, APPELLEE

On Appeal from the 272nd District Court
Brazos County, Texas
Trial Court No. 06-002328-CV-272, Honorable Travis B. Bryan III, Presiding

June 27, 2013

## OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Texas Student Housing Authority (TSHA) appeals the trial court's judgment in favor of Brazos Central Appraisal District (BCAD) (formerly known as Brazos County Appraisal District) and its Appraisal Review Board in which the trial court denied TSHA tax exempt status on certain real and business personal property for the years 2005 through 2008. On appeal, TSHA contends the trial court erred by concluding that it was

not entitled to tax exemptions under any of the several asserted tax exemptions it claimed. We will affirm in part and reverse and render in part.

Factual and Procedural History

The Dispute Leading up to This Appeal

After enjoying exemption from ad valorem taxes for the years 2002 through 2004, TSHA was denied tax exempt status beginning in the year 2005 through the year 2008. TSHA unsuccessfully protested the denials, maintaining that it was entitled to exemption from ad valorem taxes by way of the Texas Education Code. See TEX. EDUC. CODE ANN. § 53.46 (West 2012). Initially, the parties disagreed over the valuation of the property as well, though that disagreement seems to have been resolved, leaving only the issue of the application of a tax exemption to the TSHA property. The simplicity of that statement, however, belies the maze of factual and legal issues involved in the interpretation and application of various tax exemptions as they may or may not apply to the TSHA property.

About TSHA

TSHA is a higher education facility authority created in 1995 by the Town of Westlake, Texas, and is duly organized and existing under the Texas Higher Education Authority Act. See TEX. EDUC. CODE ANN. §§ 53.02(3), 53.11 (West 2012); see generally id. §§ 53.01–53.49 (West 2012). TSHA holds title to the property at issue, The Cambridge at College Station, which is a residential facility in College Station, Brazos County, Texas. The Cambridge consists of approximately 196 "dorm-like"

rooms, a cafeteria, a swimming pool, and related amenities on approximately eight acres near the campuses of Texas A & M University (TAMU) and Blinn College.

Creation and Mission of Texas A & M University[1]

The Legislature created the TAMU System and provided that the government of the TAMU System would be vested in a nine-member board of regents which would have a number of specific duties but would be charged generally with the following duty:

> The board shall make bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services. The board shall regulate the course of study and prescribe the course of discipline necessary to enforce the faithful discharge of the duties of the officers, faculty, and students.

Id. § 85.21(a) (West 2002); see also id. § 85.11 (West 2002). The Texas Education Code designates TAMU as an institution of higher education located in the city of College Station and places it under the "the management and control of the board of directors of The Texas A & M University System." Id. § 86.02 (West 2002). The code then outlines TAMU's general mission as follows:

> The leading object of the university shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanical arts, in such manner as the legislature may prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life.

Id. § 86.03 (West 2002).

---

[1] Because none of the identified programs or events at issue involve Blinn College, we concentrate our analysis on TAMU and note only that Blinn College's mission as a public junior college is outlined in the Texas Education Code. See id. § 130.0011 (West 2002).

3

In addition to outlining TAMU's general mission statement, the Texas Education Code also provides a number of other educational programs with which TAMU is charged:

> The board shall provide for a special summer school of at least two months each year for the training of special students who shall be admitted without an entrance examination, and may make provisions for the summer school, purchase the necessary equipment, and generally do and perform all acts necessary to establish and maintain the summer school.

Id. § 86.14 (West 2002). Additionally, "[t]he board shall require the teaching of elementary agriculture for teachers in the summer sessions." Id. § 86.15 (West 2002). Further, TAMU is charged with the following educational duty:

> The Texas A & M University System shall conduct and maintain a firemen's training school through the Texas Engineering Extension Service as a unit of the university system in the manner deemed expedient and advisable by the system's board of regents. The Texas Engineering Extension Service shall serve as the recognized statewide fire and rescue training agency liaison to the National Fire Academy. In their capacity as the National Fire Academy liaison, the extension service shall distribute National Fire Academy student manuals on request to associations, fire departments, state agencies, and institutions of higher education which meet National Fire Academy qualifications.

Id. § 86.16(a) (West 2002).

The Texas Education Code also designates a number of "agencies and services" of the TAMU System: (1) the Texas Forest Service, (2) the Texas Agricultural Experiment Station, (3) the Texas Agricultural Extension Service, (4) the Texas Engineering Experiment Station, (5) the Texas Engineering Extension Service, and (6) other agencies and services that may be established by law or by action of the board of directors. See id. § 88.001 (West 2002). Within the Texas AgriLife Extension Service

4

(TAES) (formerly known as Texas Cooperative Extension) operates the Texas 4-H and Youth Development program.[2]

Summer Programs at TAMU

The parties stipulated to the majority of the underlying facts. Indeed, they seemed to agree as to many of the details surrounding the summer programs at issue.

Summer 2005

The 4-H Roundup

In the summer of 2005, TSHA provided housing to participants attending the 4-H Roundup. This event is organized and administered by the Texas 4-H and Youth Development Program service of TAES, an entity which, again, is categorized as one of the "agencies and services" of the TAMU System. See id. §§ 88.001(3), 88.821. 4-H Roundup attendees were district qualifiers who ranged in age from fifteen to nineteen years of age. At the Roundup, attendees competed in various educational challenges and attended various educational workshops. Scholarships were also awarded at the Roundup. All Roundup events were held on the TAMU campus. TAES was required to go through the application and approval process with TAMU's Office of Student Affairs,

---

[2]"Agricultural Extension" and "Agrilife Extension" seem to be used interchangeably. See id. §§ 88.001(3), 88.821 (West Supp. 2012). According to the Texas A & M AgriLife Extension website, the mission of Texas 4-H is as follows: "Prepare youth to meet the challenges of childhood, adolescence and adulthood, through a coordinated, long-term, progressive series of educational experiences that enhance life skills and develop social, emotional, physical and cognitive competencies." See Tex. A & M AgriLife Extension, *Learn about 4-H*, TEXAS 4-H AND YOUTH DEVELOPMENT, http://texas4-h.tamu.edu/learn (last visited June 7, 2013).

and TAES made arrangements with and paid fees to TAMU for the use of campus facilities.

Joint Admission Medical Program (JAMP)

Also beginning in the summer of 2005, TSHA provided housing for those individuals attending JAMP. JAMP was created by the state legislature to achieve the following objectives:

> The Joint Admission Medical Program is a program administered by the Joint Admission Medical Program Council to:
>
> (1) provide services to support and encourage highly qualified, economically disadvantaged students pursuing a medical education;
>
> (2) award undergraduate and graduate scholarships and summer stipends to those students; and
>
> (3) guarantee the admission of those students to at least one participating medical school, subject to the conditions under Section 51.827 and under other provisions of this subchapter.

Id. § 51.822 (West 2012). Medical schools participating in JAMP include the University of Texas Health Science Center at Houston, the University of Texas Southwestern Medical Center at Dallas, the University of Texas Health Science Center at San Antonio, the University of Texas Medical Branch at Galveston, the medical school at Texas Tech University Health Sciences Center at Lubbock, Texas Tech University Health Sciences Center at El Paso, Baylor College of Medicine, the college of osteopathic medicine at the University of North Texas Health Science Center at Fort Worth, and Texas A & M University System Health Science Center. See id. § 51.821(4)(A)–(I) (West 2012).

JAMP participants are students of an institution of higher learning who have completed at least twenty-seven credit hours as college freshmen. The participants attend a six-week program at TAMU which includes course studies and rotations with doctors who practice in various fields of medicine. Participants must apply to and be accepted into the program. JAMP participants have library and parking privileges at TAMU in addition to their courses of study. TAMU contacted TSHA and requested TSHA's bid for housing and board for JAMP participants. TSHA submitted a winning bid, and TAMU issued a purchase order. TSHA submitted invoices to and was paid by TAMU.

Summer 2006

Summer Athletic Camps

Beginning in 2006, TSHA provided housing for participants in TAMU's tennis, volleyball, and swim camps in addition to continuing to provide housing for the 4-H Roundup and JAMP.[3] TAMU officials solicited bids from TSHA for housing the athletic camp attendees. As with JAMP, TSHA sent invoices to TAMU directly, and TAMU paid those invoices. The parties stipulated that the TSHA property was used solely to provide housing and board to the faculty and students who were attending the TAMU summer athletics camps. Each of the TAMU summer athletics camps was conducted directly by TAMU's Athletic Department.

Hockey Ministries International Hockey Camp

---

[3] In 2008, TSHA also provided housing for attendees of TAMU's golf camp.

Also beginning in the summer of 2006, TSHA began housing attendees of a hockey camp organized by Hockey Ministries International (HMI), a Christian charity registered in Canada and the United States. The parties' stipulated facts provide that, in coordination with the TAMU ice hockey teams, HMI conducted one-week camps during the summers of 2006–2008 for the purpose of instructing children on hockey skills. The parties also stipulated that, at TAMU, ice hockey is a club sport. The men's team competes in the West Region of the American Hockey Association Division II; the TAMU Women's Hockey Club is "a recognized organization" at TAMU.

Team members from the men's and women's team serve as counselors at the HMI hockey camp, and at least one of the TAMU hockey coaches participates in the hockey camp each year. TSHA property was used solely to provide housing to the counselors and participants who participated in the annual event. The instructional activities of HMI's hockey camp took place at the Arctic Wolf Ice Center, a privately owned facility. The parties stipulated that, "[a]lthough the HMI hockey camp is sponsored by TAMU's Recreational Sports Department and the TAMU Men's Hockey and Women's Hockey Clubs, TSHA directly invoices HMI and HMI pays TSHA for the housing provided to the hockey camp participants." The record reveals an open letter from TAMU's Recreational Sports Department confirming its sponsorship of the HMI hockey camp in 2006: "I would like to confirm that the Texas A & M Ice Hockey Team will proudly sponsor the Hockey Ministries International hockey camp held the summer of 2006 at the Arctic Wolf Ice Center."

In stipulated testimony, Doug Halcomb, an HMI officer who is personally involved in the hockey camp in College Station, explained that "The Cambridge provides quality,

8

safe, and secure housing for the participants in hockey camp. Use of the Cambridge for the hockey camp benefits TAMU, its students, faculty, and members, because it favorably promotes TAMU, and its enrollment at TAMU." Halcomb went on to explain that "HMI does not profit from the hockey camp, or the use of the Cambridge. The expense to conduct the camp exceed[s] the revenues received by HMI, and HMI relies on donations to cover the shortfall."

Summer 2007

TSHA continued to provide housing and board for participants in JAMP, TAMU's summer athletics camps, and HMI hockey camp. Apparently, TSHA no longer provided housing for the 4-H Roundup.

Summer 2008

UCA Cheer Camp

In summer 2008, TSHA again provided housing for JAMP participants and attendees of both TAMU's summer athletics camps and HMI's Hockey Camp. Additionally, it provided housing for UCA Cheer Camp in June and August 2008. UCA is an assumed name of Varsity Spirit Corporation, a Tennessee for-profit corporation. UCA provides training for college and high school cheerleaders through summer camps and clinics held on college campuses. The parties stipulated that the TAMU's Recreational Sports Department sponsored the UCA summer camps at TAMU. UCA was required to register and receive approval through TAMU. TAMU did approve the event. Nonetheless, TSHA billed UCA directly, and UCA paid the invoice from TSHA.

In stipulations regarding testimony, Paula Opal, who works in TAMU's Recreational Sports Department and is responsible for budgeting and coordinating certain camps, including UCA Cheer Camp, would have testified that TAMU's Recreational Sports Department receives revenues and generates a profit from its association with UCA Cheer Camp. Opal explained that housing the participants at The Cambridge increases the number of participants, which generates more profits for TAMU which, then, permits the Recreational Sports Department to offer more activities and better facilities to TAMU's students, faculty, and staff. Additionally, the parties stipulated, Opal would have testified that UCA Cheer Camp furthers TAMU's educational purposes.

Trial Testimony

The sole witness to testify at the trial to the bench was Peter Ehrenberg, TSHA's Executive Director. He testified at the trial that demand for housing and board at The Cambridge is naturally lower in the summer. He testified that only approximately ten percent of The Cambridge's rooms were occupied by "regular students that would go to Texas A & M University or Blinn College." Ehrenberg explained how the summer use of The Cambridge benefits the university, its faculty, staff, and students:

> I think that there're a number of ways that it does that. Obviously, one of the ways is that The Cambridge is able to provide housing for the summer school students that attend both A & M and Blinn, and I think that gives some revenue to the university which they may not otherwise be able to get. As I understand it, the majority of the dorms at A & M are closed during the summer. And so we do have the ability to be able to do that.

Ehrenberg also described how, without supplementing the summer occupancy at The Cambridge with summer program attendees in the manner TSHA had been doing, it

would be nearly impossible to keep The Cambridge open during the summer months. This closing would mean laying off approximately fifty people and displacing the traditional university students who did choose to stay at The Cambridge during the summer while attending regular summer school at either TAMU or Blinn College.

The Underlying Proceedings and the Trial Court's Judgment

TSHA sought judicial review of BCAD's denials of TSHA's exempt status for the years 2005 through 2008.  In its petition, it re-urged its entitlement to the tax exemption provided in the Texas Education Code.  See TEX. EDUC. CODE ANN. § 53.46.  It also contended that it is entitled to a tax exemption based on the Texas Constitution and provisions of the Texas Tax Code.  See TEX. CONST. art. XI, § 9; TEX. TAX CODE ANN. § 11.11(a), (e) (West Supp. 2012).

The trial court found that, during the years 2005 through 2008, although The Cambridge's primary use was housing and boarding students of an institution of higher learning, The Cambridge also housed and boarded "persons who were not students, faculty or staff members of an institution of higher learning."  The trial court went on to conclude that, because the TSHA property was "not used exclusively for housing or boarding, or housing and boarding students, faculty or staff of an institution of higher learning," that TSHA was not entitled to a tax exemption under section 53.46 of the Texas Education Code.

TSHA objected to the proposed findings of fact and conclusions of law not only as to the conclusion that it was not entitled to an exemption under section 53.46 of the Texas Education Code, but also as to the trial court's failure to analyze the exemptions

11

TSHA claimed under the Texas Constitution and the Texas Tax Code. TSHA also requested amended and additional findings of fact and conclusions of law in which it similarly contended as follows:

> The foregoing conclusion of law [that TSHA is not entitled to an exemption under the Texas Education Code's section 53.46] is not supported by the evidence admitted at trial and is contrary to the law. Specifically, the law establishes that TSHA is exempt from taxation pursuant to Art. X[I], § 9 of the Texas Constitution and Section 11.11 of the Tax Code, as well as Chapter 53 of the Education Code.
>
> Accordingly, conclusion of law number 1 should be amended, or additional conclusions of law be entered, to reflect that TSHA sought tax exemption under all of the foregoing laws and why the provision of the Texas Constitution and Tax Code were not applied by the Court.

### Standards of Review

Findings of fact in a case tried to the bench have the same force and dignity as a jury's verdict upon questions. Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991); In re Marriage of Bivins, 393 S.W.3d 893, 899 (Tex.App.—Waco 2012, pet. denied). We, therefore, evaluate the sufficiency of the evidence to support those findings by the same standards for evaluating the legal and factual sufficiency of the evidence to support a jury verdict. See Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); Harris Cnty. Appraisal Dist. v. Se. Tex. Hous. Fin. Corp., 991 S.W.2d 18, 20 (Tex.App.—Amarillo 1998, no pet.). Under the legal sufficiency standard, we must credit evidence that supports the judgment if a reasonable fact-finder could, and we must disregard contrary evidence unless a reasonable fact-finder could not. See City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). Unless there is no favorable evidence to support the challenged finding or the contrary evidence renders supporting evidence incompetent or conclusively establishes the opposite of the finding, we must

affirm.  See id. at 810–11.  In reviewing the factual sufficiency of the evidence, we consider all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

A trial court's conclusions of law are always reviewable.  Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ).  Conclusions of law may not be challenged for factual insufficiency, but the trial court's conclusions drawn from the facts may be reviewed to determine their correctness.  Harris Cnty. Appraisal Dist., 991 S.W.2d at 22.  Because a trial court has no discretion in determining what the law is or applying the law to the facts, we review a trial court's conclusions of law *de novo.*  See Okorafor v. Uncle Sam & Assocs., 295 S.W.3d 27, 38 (Tex.App.—Houston [1st Dist.] 2009, pet. denied).  Conclusions of law "will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence" and, unless erroneous as a matter of law, will not be reversed.  Westech Eng'g, Inc., 835 S.W.2d at 196.  In conducting a *de novo* review, we may reexamine legal conclusions drawn from specific findings of fact contained in the record.  See id. at 196 n.1.  We exercise our own judgment on each issue and afford no deference to the original tribunal's decision.  See Quick v. City of Austin, 7 S.W.3d 109, 116 (Tex. 1999).

## Rules of Construction

All real property in the State of Texas is taxable unless it is exempt as required or permitted by the Texas Constitution.  See TEX. CONST. art. VIII, § 1(b).  "To promote

13

uniformity and equality in taxation, we construe tax exemptions—and provisions tantamount to tax exemptions—strictly against the taxpayer and in favor of the taxing authority."  Gables Realty L.P. v. Travis Cent. Appraisal Dist., 81 S.W.3d 869, 872 (Tex.App.—Austin 2002, pet. denied) (quoting Tex. Utils. Elec. Co. v. Sharp, 962 S.W.2d 723, 726 (Tex.App.—Austin 1998, pet. denied)); see Hilltop Village, Inc. v. Kerrville Indep. Sch. Dist., 426 S.W.2d 943, 948 (Tex. 1968).  That is, when an entity claims a tax exemption, we employ a presumption favoring the taxing entity rather than the taxpayer.  See Tracfone Wireless, Inc. v. Comm'n on State Emergency Commc'ns, 56 Tex. Sup. Ct. J. 458, 2013 Tex. LEXIS 269, at *25–26 (Apr. 5, 2013).  Clearly, "exemptions from taxation are not favored by the law."  See N. Alamo Water Supply Corp. v. Willacy Cnty. Appraisal Dist., 804 S.W.2d 894, 899 (Tex. 1991).  Indeed, the Texas Supreme Court has reiterated the reasoning behind the disfavor with which courts treat tax exemptions and the rules of construction resulting from this disfavor and by which we must analyze tax exemptions:

> Statutory exemptions from taxation are subject to strict construction since they are the antithesis of equality and uniformity and because they place a greater burden on other taxpaying businesses and individuals.  An exemption cannot be raised by implication, but must affirmatively appear, and all doubts are resolved in favor of taxing authority and against the claimant.  Simply stated, the burden of proof is on the claimant to clearly show that it comes within the statutory exemption.

AHF Arbors at Huntsville I, LLC v. Walker Cnty. Appraisal Dist., 55 Tex. Sup. Ct. J. 835, 2012 Tex. LEXIS 465, at *18 n.30 (June 8, 2012) (quoting Bullock v. Nat'l Bancshares Corp., 584 S.W.2d 268, 271–72 (Tex. 1979)).

Analysis

Exemption under the Texas Education Code

Again, TSHA asserted that it is entitled to an exemption from ad valorem taxation based on the following exemption:

> Because the property owned by authority will be held for educational purposes only and will be devoted exclusively to the use and benefit of the students, faculty, and staff members of an accredited institution of higher education, it is exempt from taxation of every character.

TEX. EDUC. CODE ANN. § 53.46.

In our review of the provisions relevant to TAMU's educational mission, its legislative directives, and its legislatively designated agencies and services, the term "student" in this factual context is broader than the definition proposed or envisioned by BCAD. That is, the term "student" would encompass more than the traditional, full-time student enrolled in regular classes offered by the university. Chapter 53 of the Texas Education Code does not define "student."[4] In the absence of statutory definition, we

---

[4] TSHA points out in its brief that the Texas Education Code does define "student" elsewhere as a person who "is registered or in attendance at an educational institution." See id. § 37.151(4)(A) (West 2012) (relating to public school safety and discipline, specifically hazing). We add that "student" is also defined elsewhere as "any prospective, current, or former student of: (A) a career school or college; or (B) any other school, educational institution, or business entity from which the commission receives, or regarding which the commission reviews, information through its administration or enforcement of this chapter." See id. § 132.024(a)(1) (West Supp. 2012) (defining "student" in relation to junior colleges and career schools and colleges, still within Title 3 of the Texas Education Code covering higher education). "[W]hen construing a statutory word or phrase, we may consider the meaning assigned to the term elsewhere in the act or in another act of similar nature." Robertson v. Odom, 296 S.W.3d 151, 157 (Tex.App.—Houston [14th Dist.] 2009, no pet.) (citing Guthery v.

15

use the term in its ordinary and common usage.  See TEX. GOV'T CODE ANN. § 311.011(a) (West 2013).  In its ordinary and common usage, a "student" is "one who attends a school" or "one who studies," "an attentive and systematic observer." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1239 (11th ed. 2003).

Here, in fulfilling its legislatively mandated general educational objective and in consideration of the breadth of the classes and programs the legislature had directed TAMU to offer in addition to its regular curriculum, TAMU is fairly characterized as a multi-faceted institution of higher education.  It naturally follows from its broad and varied educational directives that TAMU has a wide variety of "students" in the ordinary and common sense of the word.

4-H Roundup and JAMP

There are distinctions to be made here among the various programs for which TSHA provided housing and board.  With the 4-H Roundup and JAMP programs, TAMU has definite and intimate relationships, ones which are forged or supported by legislative mandate.  See TEX. EDUC. CODE ANN. §§ 51.821(4)(I), 88.001(3).  Based on these close relationships, TAMU's considerable involvement, and the absence of other, non-university related entities, program or camp participants in these events are

Taylor, 112 S.W.3d 715, 721 (Tex.App.—Houston [14th Dist.] 2003, no pet.)).  To the extent that sections 37.151 and 132.024 are similar in nature to Chapter 53, we consider the definitions of "student" advanced in those sections.  See Robertson, 296 S.W.3d at 157; Guthery, 112 S.W.3d at 721.  However, recognizing that the provisions defining "student" are aimed at rather diverse goals, we note that the common and ordinary usage of the term "student" as advanced in the common dictionary is, at a minimum, not "out of harmony or inconsistent with" the definitions of "student" used in other parts of the Texas Education Code.  See Tex. Dep't of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002).

"students" of TAMU. The breadth of TAMU's educational mission and objectives as evidenced by the wide variety of programs with which it is charged, and TAMU's involvement with and connection to the 4-H Roundup and JAMP events lead us to conclude that participants in those events are "students" of TAMU.

We do remain mindful that we are to strictly construe exemptions and that they are not favored in the law. See AHF Arbors, 2012 Tex. App. LEXIS 465, at *18 n.30; N. Alamo Water Supply, 804 S.W.2d at 899. However, our conclusion does not run afoul of such directive; when an individual attends an event or program with which the state legislature has specifically charged a university, that individual is fairly considered a "student" of that university such that provision of housing and board to that person would not run afoul of the exclusivity element of section 53.46's tax exemption.

With respect to the 4-H Roundup and the JAMP program, we conclude that such programs fall within the ambit of section 53.46 when we consider the nature of the programs, the legislatively mandated relationships between TAMU and the 4-H and JAMP programs, and TAMU's involved role in requisitioning and paying for the housing and board provided by TSHA. See TEX. EDUC. CODE ANN. §§ 51.821(4)(I), 88.001(3). So, not having provided housing and board in such a way as to step outside the scope of section 53.46, The Cambridge should have continued to enjoy the previously granted exemption from ad valorem taxes for the year 2005, when the programs for which it provided housing and board included only 4-H and JAMP.

Beginning in 2006, TSHA began to house participants in TAMU's officially sanctioned, department-conducted athletics camps. Ultimately, the provision of housing

17

for the TAMU athletics camps will not be dispositive to the viability of the exemption for the years 2006 through 2008 because additional concerns with regard to TSHA's exemption surface when it began to provide housing for HMI Hockey Camp in 2006 and UCA Cheer Camp beginning in 2008. We, therefore, need not pass on the impact, if any, the provision of housing for these athletics camps would have on TSHA's eligibility for a section 53.46 tax exemption beginning in the year 2006. TEX. R. APP. P. 47.1.

HMI Hockey and UCA Cheer Camps

The relationships between TAMU and the hockey and cheerleading camps are distinguishable from those it maintains with the 4-H and JAMP events. The principle or primary organizers of the hockey and cheerleading camps are wholly separate from the university: HMI is a charitable organization entirely unrelated to TAMU, and UCA is an out-of-state for-profit corporation. These entities paid TSHA directly for the housing TSHA provided to camp participants. TAMU is involved to some degree by acting as host and/or sponsor of these events and, at least with respect to UCA Cheer Camp, the record shows that TAMU's Recreational Sports Department receives revenues and makes a profit from its involvement with the camp, funds which the department puts back into the services and facilities which serve the university's staff and student body.

Nonetheless, it was not TAMU which solely, perhaps not even primarily, sponsored, was involved in, or benefitted from TSHA's provision of housing and board for hockey and cheerleading camp participants. The fact that non-university entities organized, developed, and even profited in some sense from the programs serves to underscore that TAMU and those particular programs—that is, HMI Hockey Camp and

UCA Cheer Camp—do not share relationships of any legislative origin such that the participants in those programs could be fairly considered "students" of TAMU. With that, we cannot conclude with any amount of confidence that, during the years 2006 through 2008, The Cambridge was "devoted exclusively to the use and benefit of the students, faculty, and staff members of an accredited institution of higher education." See Tex. Educ. Code Ann. § 53.46. For the years 2006 through 2008, we resolve the doubt arising from the involvement of non-university entities against TSHA, against exemption, and in favor of BCAD. See AHF Arbors, 2012 Tex. App. LEXIS 465, at *18 n.30.

The Relationship between Tax Code Exemptions and Section 53.46

In the myriad of contentions and alternative contentions, the issue has been raised that the effect of certain provisions in the Texas Tax Code is to effectively repeal section 53.46 of the Texas Education Code. This issue is one we need not resolve at this point in time. Even if the proper interpretation of section 11.11 of the Texas Tax Code and its impact as to section 53.46 of the Texas Education Code were to lead to the conclusion that section 53.46 had been effectively repealed and is no longer of force, we could nonetheless conclude that TSHA was entitled to a tax exemption under Article XI, section 9, but, again, only with respect to the housing and boarding of "students" attending the 4-H Roundup and JAMP.[5]

---

[5] In arriving at this conclusion, we necessarily reject BCAD's contention that TSHA failed to preserve for our review issues relating to alternative exemptions; indeed, the various exemptions were discussed at length in the trial to the bench and were specifically raised in both TSHA's objections to the proposed findings of fact and conclusions of law and its request for additional or amended findings of fact and

Exemption under the Texas Constitution

In pertinent part, the Texas Constitution provides as follows:

> The property of counties, cities and towns, owned and held only for public purposes, such as public buildings and the sites therefor, fire engines and the furniture thereof, and all property used, or intended for extinguishing fires, public grounds and all other property devoted exclusively to the use and benefit of the public shall be exempt from forced sale and from taxation, provided, nothing herein shall prevent the enforcement of the vendors lien, the mechanics or builders lien, or other liens now existing.

TEX. CONST. art. XI, § 9. Courts have traditionally treated Article XI, section 9, as self-operative. See Leander Indep. Sch. Dist. v. Cedar Park Water Supply Corp., 479 S.W.2d 908, 912 (Tex. 1972); see also A & M Consol. Indep. Sch. Dist. v. City of Bryan, 143 Tex. 348, 184 S.W.2d 914, 915 (1945) (distinguishing the effect—not necessarily the subject matter of—Article XI, section 9, which operates to exempt certain property from taxation, from Article VIII, section 2, which authorizes the legislature to pass laws that exempt certain property meeting the standard outlined in that article).

---

conclusions of law. See TEX. R. CIV. P. 298. TSHA's proposed findings and conclusions represent more than a "bare request" for additional or amended findings and conclusions. See Alvarez v. Espinoza, 844 S.W.2d 238, 241–42 (Tex.App.—San Antonio 1992, writ dism'd w.o.j.) (en banc) (op. on reh'g) (per curiam). We conclude that all the exemptions raised below are properly before this Court for our consideration.

That said, we do not rest our decision primarily and solely on the basis of Article XI, section 9, because we should first decide the issue on a nonconstitutional basis if possible. See VanDevender v. Woods, 222 S.W.3d 430, 432 (Tex. 2007) (noting that courts should rest decisions on nonconstitutional grounds, if available, and not "wade into ancillary constitutional questions"); In re B.L.D., 113 S.W.3d 340, 349 (Tex. 2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds."). In an attempt to maintain judicial restraint in the face of the complex issues raised on appeal, we address the constitutional matter only insofar as doing so is necessary to address the issues raised (1) whether provisions of the Texas Tax Code effectively repealed section 53.46 of the Texas Education Code and (2) whether any other of the provisions cited by TSHA operate to exempt the property in light of TSHA's provision of housing for these programs.

20

Traditionally, courts have analyzed matters relating to Article XI, section 9, in two distinct phases: (1) public ownership issues and (2) exclusive public purpose issues. See Leander Indep. Sch. Dist., 479 S.W.2d at 912 (observing that both public ownership and public purpose elements must be satisfied); Tex. Tpk. Co. v. Dallas Cnty., 153 Tex. 474, 271 S.W.2d 400, 401 (1954) (after concluding that disputed property was not publicly owned, declining further analysis into "nature of its use"); A & M Consol. Indep. Sch. Dist., 184 S.W.2d at 915 (addressing the applicability of Article XI, section 9, by examining ownership and purpose issues in turn); see also Hays Cnty. Appraisal Dist. v. Sw. Tex. State Univ., 973 S.W.2d 419, 422–23 (Tex.App.—Austin 1998, no pet.) (addressing separately the issues of public ownership and public purpose); Cent. Appraisal Dist. of Erath Cnty. v. Pecan Valley Facilities, Inc., 704 S.W.2d 86, 89–90 (Tex.App.—Eastland 1985, writ ref'd n.r.e.) (same). To the extent possible in light of binding Texas Supreme Court precedent interpreting "counties, cities and towns," we adhere to the following general rule when examining a constitutional provision: "The language of the Constitution must be presumed to have been carefully selected, and the words used are to be interpreted as the people generally understood them." Leander Indep. Sch. Dist., 479 S.W.2d at 912.

Public Ownership Element of Article XI, section 9

Though at first glance Article XI, section 9, would appear rather limited, we note that the Texas Supreme Court provided an enduring, broad interpretation of Article XI, section 9, equating its "counties, cities or towns" to "a governmental agency." See Lower Colo. River Auth. v. Chem. Bank & Trust Co., 144 Tex. 326, 190 S.W.2d 48, 50 (1945). This broad interpretation included the Lower Colorado River Authority (LCRA),

a creature of legislation which deemed it "a governmental agency and body politic and corporate." See id. Although subsequent Texas Supreme Court cases have expressed a reluctance or hesitance regarding the breadth of LCRA's interpretation of "counties, cities and towns," none has directly overruled or otherwise restricted it. See Satterlee v. Gulf Coast Waste Disposal Auth., 576 S.W.2d 773, 779 (Tex. 1978) (op. on reh'g) (noting the breadth of LCRA's interpretation, declining to reconsider the holding, also declining to apply that interpretation, and, instead, deciding the issue presented on rehearing in terms of "public purpose"); Leander Indep. Sch. Dist., 479 S.W.2d at 911, 913 (in deciding issues concerning a different but related constitutional provision, outlining LCRA's interpretation and observing that what it characterizes as "an erroneous interpretation" is now "firmly embedded in our jurisprudence").

Though no clear test has emerged to determine whether an entity falls within the scope of LCRA's interpretation of Article XI, section 9, the Texas Supreme Court has found that the term "counties, cities and towns" includes the following entities: (1) the LCRA, created by statute as "a governmental agency and body politic and corporate, with the powers of government" and the creation of which was "determined to be essential to the accomplishment of the purposes of Section 59 of Article 16 of the Constitution of the State of Texas," and (2) the City of Bryan, Texas, a municipal corporation. See LCRA, 190 S.W.2d at 50; A & M Consol. Indep. Sch. Dist., 184 S.W.2d at 915. We see that, though broad, LCRA's interpretation does have outer boundaries, however:

> [T]he undisputed facts reveal that Pecan Valley is a nonprofit corporation created by private individuals. Pecan Valley is not connected, in any way, with a county, city, town, state, or any other political subdivision or

22

> sovereignty. Pecan Valley's only connection with a governmental agency is its leasing arrangements with the Region. Such leasing arrangements do not make Pecan Valley a governmental entity or agency. The evidence conclusively establishes that Pecan Valley is a private, non-profit, Texas corporation. It is, therefore, not entitled to an exemption under Article XI, Section 9.

Pecan Valley Facilities, 704 S.W.2d at 89.

The Texas Education Code designates a higher education facility authority created under its provisions as "a body politic and corporate having the power of perpetual succession." TEX. EDUC. CODE ANN. § 53.13 (West 2012). "It shall have a seal; it may sue and be sued; and it may make, amend, and repeal its bylaws." Id. A "body politic" is defined as "[a] group of people regarded in a political (rather than private) sense and organized under a common governmental authority." BLACK'S LAW DICTIONARY 198 (9th ed. 2009); see Tex. Att'y Gen. Op. No. MW-177 (1980) (characterizing a higher education authority created pursuant to Chapter 53 of the Texas Education Code in terms of various statutory provisions). A higher education facility authority "has no power to tax" and "does not have the power of eminent domain," however. See TEX. EDUC. CODE ANN. §§ 53.31, 53.32 (West 2012).

In light of the breadth of LCRA's interpretation and application of Article XI, section 9, TSHA, as a legislatively created body politic and corporate and an instrumentality of a municipality, is an entity which would fall within LCRA's broad interpretation of "counties, cities or towns" such that the public ownership prong of Article XI, section 9, would be satisfied. Cf. LCRA, 190 S.W.2d at 50 (concluding that the LCRA, "a governmental agency and body politic and corporate," falls within Article XI, section 9's "counties, cities and towns").

23

Public Purpose Element of Article XI, section 9

What use constitutes exclusive public purpose within Article XI, section 9, has long been a question Texas courts have considered. In fact, the very question we address in the instant case was addressed in similar fashion by the Texas Supreme Court in 1884 when, while considering the character of the use of Galveston Wharf in terms of Article XI, section 9, it observed the following:

> It is property held only for purposes essentially public, and may be said to be devoted exclusively to the use and benefit of the public; indeed, it would be hard to imagine a use more essentially public than is that of a wharf which extends along the front of a city, and upon which is received a large part of the articles which go to make up the inward and outward commerce of the state. It is a property which all persons and vessels have the right to use, under proper regulations, and without the use of which the business of the city could not be conducted. That compensation is received for its use does not withdraw from it its public character.

Galveston Wharf Co. v. City of Galveston, 63 Tex. 14, 23 (1884).

Over the years that would follow Galveston Wharf Company, we see certain rules develop to aid in the determination of whether a property is "devoted exclusively to the use and benefit of the public." For instance, generally speaking, property serves a public purpose when "it is used primarily for the health, comfort, and welfare of the public," and "all the public has the right to use it under reasonable and uniform regulations." See A & M Consol. Indep. Sch. Dist., 184 S.W.2d at 915, 916.

Further, it is not essential that the property at issue be used for "governmental purposes." See id. at 915 (citing Corp. of San Felipe de Austin v. State, 111 Tex. 108, 229 S.W. 845 (1921)). In San Felipe de Austin, a case with a factual background rich in early Texas history, the Texas Supreme Court concluded that the land in question did

24

serve a public purpose when the municipality's residents publicly used the land for grazing purposes and as a source of firewood in accordance with the terms of the original Mexican grant.[6]  San Felipe de Austin, 229 S.W. at 846.  The Texas Supreme Court recognized the LCRA as an entity "essential to the accomplishment" of constitutionally mandated purposes relating to the control, storage, and preservation of the waters of the Colorado River.  See LCRA, 190 S.W.2d at 50 (citing TEX. CONST. art. XVI, § 59(a)).

"It appears that the use to which the property itself is put is of primary importance" in determining whether the exclusive public purpose element of Article XI, section 9, has been satisfied, regardless of any subsequent or indirect benefit such use may inure to the public in the way of reinvested funds.  See City of Beaumont v. Fertitta, 415 S.W.2d 902, 908 (Tex. 1967) (op. on reh'g).  So, "[g]overnmental receipt and use of proceeds arising from commercial usage of the property does not, under article XI, section 9, qualify the use of the property itself as public."  Hays Cnty. Appraisal Dist., 973 S.W.2d at 423.

---

[6] The Texas Supreme Court explained the historical origins of the public use of the land in the very unique fact situation presented in San Felipe de Austin:

> Following the independence of Texas, the town of San Felipe de Austin was incorporated by a special act of the Congress of the Republic, in 1837.  This act confirmed to the municipality title to all the public property in it.  This act was amended by one approved January 20, 1841, which also confirmed to the citizens of the municipality all the powers and property originally granted by the Mexican Government, and providing that the powers and jurisdiction of the town should extend over the whole territory belonging to it.

San Felipe de Austin, 229 S.W at 846.

4-H Roundup and JAMP Events

We refer to our previous discussion of the legislature's directives aimed at TAMU. TAMU is directed to hold certain educational courses and is specifically and legislatively connected to the 4-H and JAMP programs. Indeed, the record suggests that TAMU sponsored both of these events and specifically requested bids from The Cambridge on housing for students attending these programs. Providing housing and transportation for young people attending those programs which the legislature has deemed in furtherance of the TAMU educational mission is a public purpose within the purview of Article XI, section 9. Cf. LCRA, 190 S.W.2d at 50 (observing that entity at issue aids in achieving goals established by Texas Constitution). Certainly, serving the university's activities in furtherance of its legislatively determined educational mission and in its execution of the duly enacted laws of the State of Texas serves a public purpose. Cf. id.

HMI Hockey and UCA Cheer Camps

The involvement of HMI and UCA beginning in 2006 and 2008, respectively, raises doubts as to whether the housing of those participants serves an *exclusive* public purpose as required by Article XI, section 9. That TAMU does receive some benefit from its association with the programs is simply insufficient. Cf. City of Beaumont, 415 S.W.2d at 908 (observing that the fact that funds generated from private, commercial use of property and received by a governmental entity may ultimately serve a public purpose is inadequate to fulfill exclusive public purpose element of Article XI, section 9). So, for reasons not dissimilar to our discussion of whether participants in the HMI

Hockey Camp and UCA Cheer Camp are "students" of TAMU, we must resolve the doubts concerning the exclusive public use aspect of TSHA's provision of housing and board to participants in the hockey and cheerleading camps against TSHA, against exemption of its property from ad valorem taxation, and in favor of BCAD. See AHF Arbors, 2012 Tex. App. LEXIS 465, at *18 n.30.

De minimus exception

TSHA cites this Court to one of its own opinions for the proposition that a *de minimus* rule applies to ad valorem tax exemption given certain circumstances. See Lamb Cnty. Appraisal Dist. v. S. Plains Hosp.-Clinic, Inc., 688 S.W.2d 896, 905 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.). Lamb County Appraisal District, however, is distinguishable from the instant case for a number of reasons, not the least of which is that the Texas Tax Code provision at issue in that case expressly permitted a certain degree of "incidental" use. See id. at 901 (quoting TEX. TAX CODE ANN. § 11.18(b) (West Supp. 2012)). None of the exemptions urged in the case at bar have comparable language which could be read to permit incidental or *de minimus* use of the facilities in such a way that would disqualify the property for tax exempt status. Further, Lamb County Appraisal District becomes less persuasive in our current context in that the language TSHA cites regarding the recognition of a *de minimus* rule is presented in the context of the Court's assumption for argument's sake that the conduct at issue *did* fall outside the scope of the exemption at issue. See id. at 904–05. Lamb County Appraisal District does not establish a generally applicable *de minimus* rule that would apply to the tax exemption context with which this Court is now confronted. Indeed, application of such a rule would be inconsistent, if not antithetical, to the well- and

27

clearly-established rule of strict construction and the disfavor with which we are to treat tax exemptions.  See AHF Arbors, 2012 Tex. App. LEXIS 465, at *18 n.30.

Exemption under the Texas Tax Code

As we noted previously, the Texas Constitution encompasses two different approaches regarding exemption of public property from taxation.  First, in Article XI, section 9, it is self-operative; the property falling within its ambit is exempt from taxation pursuant to the constitutional provision itself.  "What the Constitution exempts from taxation the Legislature has no power to require to be taxed."  Daugherty v. Thompson, 71 Tex. 192, 9 S.W. 99, 102 (1888).  Secondly, by Article VIII, section 2, the Constitution grants the legislature the authority to exempt public property, providing in pertinent part that "the legislature may, by general laws, exempt from taxation public property used for public purposes."  TEX. CONST. art. VIII, § 2(a).

Section 11.11(a) of the Texas Tax Code

As authorized by Article VIII, section 2, the legislature enacted section 11.11 of the Texas Tax Code , which provides, in pertinent part, the following:

> (a) Except as provided by Subsections (b) and (c) of this section, property owned by this state or a political subdivision of this state is exempt from taxation if the property is used for public purposes.

TEX. TAX CODE ANN. § 11.11(a).  TSHA contends that it is entitled to an exemption under subsection (a) of section 11.11.  Assuming arguendo that TSHA qualifies as "a political

28

subdivision of the State," TSHA must still bear the burden of clearly showing that its property satisfies the public purpose element of section 11.11(a).[7]

Two cases from sister courts have directly addressed the issue whether section 11.11(a) requires exclusive public use. See Dallas Cnty. Appraisal Dist., 730 S.W.2d at 851; Grand Prairie Hosp. Auth. v. Tarrant Appraisal Dist., 707 S.W.2d 281, 284 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). The Grand Prairie Hospital Authority cases dealt with the same factual scenario: a hospital authority leased part of a medical office building, which adjoined the hospital, to doctors who maintained their private practices there. Dallas Cnty. Appraisal Dist., 730 S.W.2d 850; Tarrant Appraisal Dist., 707 S.W.2d at 282. Both courts were asked to determine whether the fact that a portion of the property was leased for private, commercial purposes destroyed the property's previously enjoyed tax-exempt status; both courts concluded that it did. See Dallas Cnty. Appraisal Dist., 730 S.W.2d 851 (citing Satterlee, 576 S.W.2d at 779, for exclusive public use and benefit standard); Tarrant Appraisal Dist., 707 S.W.2d at 284 (also

---

[7] We do not specifically pass on the application of section 11.11(a) to a higher education facility authority such as TSHA, again created as "a body politic" and treated in some respects as an instrumentality of the city of Westlake. Satterlee would arguably support the position that it does. See Satterlee, 576 S.W.2d at 774–75 (treating waste disposal authority created by legislation as a political subdivision of the State); see also Grand Prairie Hosp. Auth. v. Dallas Cnty. Appraisal Dist., 730 S.W.2d 849, 850 (Tex.App.—Dallas 1987, writ ref'd n.r.e.) (concluding that hospital authority, an entity organized under relevant statutory provisions, fell within section 11.11(a)'s scope and observing that it was "undisputed that the property is publicly owned since it is held by the [authority]"). Further, unlike LCRA in the Article XI, section 9 context, no case advances an arguably broad interpretation of the entities to which section 11.11(a) would apply. Cf. LCRA, 190 S.W.2d at 50.

It is on this basis that BCAD maintains section 11.11(a) is not applicable to TSHA. It is also the distinction among the entities identified that BCAD maintains that there is no conflict between section 53.46 of the Texas Education Code and section 11.11 of the Texas Tax Code. Because, as we will discuss, the property at issue does not serve a public purpose, we need not decide this particular issue.

relying on Satterlee); accord Tex. Att'y Gen. Op. No. JC-0311 (2000); Tex. Att'y Gen. Op. No. JC-0571 (2002). Indeed, both cases rely on Satterlee, which does apply an exclusive public use standard—albeit in an Article XI, section 9 context. See Satterlee, 576 S.W.2d at 779. The effect of the Grand Prairie Hospital Authority cases' adoption of the Satterlee standard is to imprint upon section 11.11(a) an exclusivity element. The Texas Supreme Court refused two opportunities to correct this imprint, had it determined that such was unsound. As it stands, however, the Grand Prairie Hospital Authority holdings have remained undisturbed since 1986 and 1987, respectively.

Here, TSHA's provision of housing to HMI hockey and UCA cheerleading camps is not, for the reasons we have discussed in relation to Article XI, section 9, a public purpose. That being so, provision of housing and board for those events—albeit for a rather short period of time—means that The Cambridge was not "devoted exclusively to the use and benefit of the public." See Dallas Cnty. Appraisal Dist., 730 S.W.2d at 851; Tarrant Appraisal Dist., 707 S.W.2d at 284; see also Satterlee, 576 S.W.2d at 779. We conclude that, to the extent section 11.11(a) of the Texas Tax Code would apply in this situation and would apply to TSHA, TSHA has failed to carry its burden of clearly showing that it comes within the statutory exemption. See AHF Arbors, 2012 Tex. LEXIS 465, at *18 n.30.

Section 11.11(e) of the Texas Tax Code

TSHA also contends that it is entitled to an exemption under subsection (e) of section 11.11, which provides the following:

(e) Property that is held or dedicated for the support, maintenance, or benefit of an institution of higher education as defined by Section 61.003,

Education Code, but is not rented or leased for compensation to a private business enterprise to be used by it for a purpose not related to the performance of the duties and functions of the state or institution or is not rented or leased to provide private residential housing to members of the public other than students and employees of the state or institution is not taxable. If a portion of property of an institution of higher education is used for public purposes and a portion is not used for those purposes, the portion of the property used for public purposes is exempt under this subsection. All oil, gas, and other mineral interests owned by an institution of higher education are exempt from all ad valorem taxes. Property bequeathed to an institution is exempt from the assessment of ad valorem taxes from the date of the decedent's death, unless:

> (1) the property is leased for compensation to a private business enterprise as provided in this subsection; or

> (2) the transfer of the property to an institution is contested in a probate court, in which case ad valorem taxes shall be assessed to the estate of the decedent until the final determination of the disposition of the property is made. The property is exempt from the assessment of ad valorem taxes upon vesting of the property in the institution.

TEX. TAX CODE ANN. § 11.11(e).

A plain reading of subsection (e) of section 11.11 yields the conclusion that it contemplates application to property owned by an institution of higher learning. We add that public ownership is determined by examining the facts surrounding the property, and, here, there is no evidence—indeed, no contention—that The Cambridge is owned by an institution of higher learning. See Tex. Tpk. Co., 271 S.W.2d at 402. From subsection (e)'s plain language, it was not intended to apply to property owned by a higher education facility authority; we are not at liberty to construe subsection (e) otherwise. See AHF Arbors, 2012 Tex. LEXIS 465, at *18 n.30; Gables Realty, 81 S.W.3d at 872.

Pro Rata Exemption

TSHA invites this Court to remand this cause to the trial court with instructions to determine the portion of the property that is used for public purposes and entitled to an exemption under section 11.11(e) of the Texas Tax Code.[8]   As is pertinent to this invitation, subsection (e) provides the following: "If a portion of property of an institution of higher education is used for public purposes and a portion is not used for those purposes, the portion of the property used for public purposes is exempt under this subsection."   TEX. TAX CODE ANN. § 11.11(e).   Again, having concluded that The Cambridge does not qualify as "property of an institution of higher education," we decline the invitation to remand for calculation of a pro rata tax exemption under Section 11.11(e).

Summary

With respect to the summer 2005 housing and boarding of students who attended the 4-H Roundup and JAMP events, TSHA should have continued to enjoy the previously granted tax exemption applied to The Cambridge; those participants are fairly considered students of TAMU in light of the programs' closely connected and legislatively created relationships to TAMU.   With that, the provision of housing and board to those participants would not undermine section 53.46's requirement that the

---

[8] Parenthetically, the notion of a pro rata approach to exemption pursuant to Article XI, section 9, has been rejected outright: "We . . . reject the procedure of subdividing property to determine whether part of the property's use is exclusive for the purposes of article XI, section 9 of the Texas Constitution."  Hays Cnty. App. Dist., 973 S.W.2d at 423.  We see no authority which would support such an approach.  In fact, such a practice would also appear to contradict the exclusivity required by Article XI, section 9.  See id.

property be "devoted exclusively to the use and benefit of the students, faculty, and staff members of an accredited institution." See TEX. EDUC. CODE ANN. § 53.46.

Beginning in the summer of 2006, when TSHA began to provide housing to HMI hockey camp attendees, such use of The Cambridge fell outside section 53.46's exclusivity requirement. That is, the direct and substantial involvement of and benefit to a non-university entity means that the property was no longer "devoted exclusively to the use and benefit of the students, faculty, and staff members of an accredited institution." See id. Adhering to the strict construction disfavoring exemptions from taxation, we resolve the doubts raised by the facts of this case against TSHA and in favor of BCAD with respect to the tax year 2006. The same resolution applies to the tax year 2007 when TSHA again provided housing and board to HMI Hockey Camp attendees. Beginning in the summer of 2008 and in addition to providing housing for hockey camp, TSHA began to provide housing for participants in UCA Cheer Camp, an event organized and developed by a for-profit corporation. Although there is evidence that TAMU did benefit financially from its involvement with the cheerleading camp, the record suggests that it was not only TAMU who benefitted from the housing and board TSHA provided to the camp attendees. The record establishes that TSHA dealt directly with UCA in terms of arranging for payment for the housing provided to those participants. We resolve the doubts associated with the facts surrounding UCA Cheer Camp against TSHA and in favor of BCAD for the tax year 2008.

Likewise, none of the other cited exemptions would operate on these facts to exempt TSHA's property from ad valorem taxation during the tax years 2006 through 2008. Assuming that TSHA is an entity to which Article XI, section 9, would apply, the

use of The Cambridge during these years does not meet the exclusive public purpose test.  See TEX. CONST. art. XI, § 9.  Similarly, such use failed to meet the exclusive public use requirements of section 11.11 of the Texas Tax Code.  See TEX. TAX CODE ANN. § 11.11(a).  Further, the property at issue is not "property owned by an institution of higher education" as contemplated by subsection (e).  See id. § 11.11(e).

## Conclusion

As to the tax year 2005, we sustain TSHA's point of error with respect to the trial court's conclusion that it was not entitled to the tax exemption provided by section 53.46 of the Texas Education Code.  Accordingly, we reverse in part the trial court's judgment, render judgment that TSHA's property is exempt from ad valorem taxation for the year 2005, and order that BCAD remove TSHA's property from its tax roll for the year of 2005.  As to the tax years 2006 through 2008, we overrule TSHA's points of error and, accordingly, affirm the trial court's judgment that the TSHA property is not exempt from ad valorem taxation for those years.  BCAD's tax rolls for those years will so reflect.


Mackey K. Hancock
Justice